# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:16-cr-00204-TWP-DML |
| GUSTAVO ROMERO-MENDEZ a/k/a GUSTAVO ROMERO (01), | ) ) ) ) |
| Defendant. | ) ) |

## ENTRY ON MOTION TO SUPPRESS

This matter is before the Court on Defendant Gustavo Romero-Mendez a/k/a Gustavo Romero's ("Romero"), Motion to Suppress (Filing No. 34). Romero is charged with violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi)—possession with intent to distribute fentanyl. He asserts that his vehicle was stopped without probable cause, the stop was unreasonably long, and the search of his vehicle was without probable cause, justifying suppression of evidence found during the search. On April 23, 2018, an evidentiary hearing was held on Romero's Motion. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now states its findings of fact and conclusions of law and determines that the Motion to Suppress should be **denied**.

## I. FINDINGS OF FACT

For approximately seven years, Officer David Glover of the Richmond, Indiana Police Department ("Officer Glover") has been assigned to the Pro-Active Criminal Enforcement unit ("PACE").[1] While conducting PACE patrol On August 22, 2016, Officer Glover received information from Deputy Nick Ernstes ("Deputy Ernstes") from the Hancock County Sheriff's

---

[1] The focus of this Task Force is to patrol the 62 mile stretch of Interstate 70 in Henry, Wayne and Hancock Counties in an attempt to apprehend individuals who are committing felonies and other criminal offenses along this area of highway. Although the PACE Team seeks to apprehend individuals who utilize Interstate 70 as a thoroughfare to

Department, who had received a call from Indiana State Police Trooper Brad Smith ("Trooper Smith") that they might want to look at a certain vehicle when it comes by. Officer Glover was given a description and the California license plate number of the vehicle. He ran the license plate number of the vehicle through the system to check for border crossings and noticed the vehicle had made numerous border crossings within an eight month period. Soon thereafter, Officer Glover observed Romero's silver Mazda 6 sedan with the particular license plate number, driving on Interstate 70 near Exit 131.

Romero disputes issues of material fact with respect to the Government's briefing and officers' affidavits; however, several dashboard camera ("dash cam") videos of the traffic stop, canine search and seizure exist and the Court is able to resolve any factual disputes using the video evidence ([Filing No. 39](Filing No. 39)) and testimony from the hearing.

Officer Glover entered the roadway behind the silver vehicle and at a point, Romero's vehicle is following closely behind a tractor-trailer. Officer Glover pulled Romero's vehicle over on the ramp for Exit 131. Officer Glover approached the vehicle, and observed that Romero and his passenger, Susana Orozco ("Orozco") were the only persons in the vehicle. Officer Glover noticed a strong odor of air fresheners inside of the vehicle. After asking for Romero's driver's license, registration, and proof of insurance, Officer Glover requested that Romero step out of the vehicle and asked for Orozco's identification. Officer Glover asked Orozco several questions, including where she and Romero were traveling, where she lives, and what was her relationship to Romero. Orozco told Officer Glover that they were traveling to Middletown, Ohio, that she lives

---

commit many different types of crimes, a primary focus of its efforts is the enforcement of traffic laws in an attempt to identify, locate and apprehend individuals engaged in the trafficking of illegal narcotics into and through the state of Indiana. http://www.henryco.org/pace.html. Last visited on May 8, 2018.

in Oakland, California, and that she and Romero are friends and are possibly dating. She further indicated that she has not known Romero for a very long time.

Once Officer Glover completed his questioning of Orozco, he went back to Romero and asked him to exit the vehicle and sit in the front seat of his patrol car. As Romero exited his vehicle, he dropped what was later determined to be a methamphetamine pipe onto the ground by the driver's door and is seen on the video kicking the pipe under the car.

While sitting in the patrol car, Officer Glover began to process Romero's information on his laptop computer and he asked Romero several of the same questions he had asked Orozco. Romero initially indicated that he and Orozco were heading toward Middletown, but he corrected himself and said that they were traveling to Daytona, and again corrected himself saying Dayton, Ohio to visit one of his friends. Additionally, Romero stated that he and Orozco are just friends but that they have known each other for a while. When Officer Glover asked Romero where Orozco is from, he responded that she is from San Francisco rather than Oakland. Romero volunteered that he is married but that he does not talk about his wife with Orozco. While processing information on his laptop computer, Officer Glover continued to engage in "small talk" asking Romero questions such as what he does for a living and how long they plan to stay in Dayton. After several minutes of questioning Romero, Officer Glover explained that he stopped him because he had been following the tractor trailer too closely and that Indiana recommends leaving about two or three seconds between cars while driving on the Interstate.

Approximately thirteen minutes after Officer Glover initially stopped Romero's vehicle, Deputy Ernstes arrived on the scene with his K-9 partner, "Manni". Officer Glover exited his patrol car to talk to Deputy Ernstes about what he had observed. Officer Glover specifically indicated that Orozco and Romero had conflicting answers as to where they were traveling and where

Orozco was from and noted that there was approximately a nine-year age difference between them, leading Officer Glover to believe the couple does not actually know one another. Based on these observations, Officer Glover asked Deputy Ernstes to conduct a dog sniff with Manni around Romero's vehicle, as he sensed criminal activity. Officer Glover then returned to his patrol car and continued to process and complete standard checks using Romero's information. Officer Glover requested standard information from Romero, such as his height and Social Security number and continued to make "small talk".

Sergeant Jim Goodwin ("Sgt. Goodwin"), another member of the PACE unit, from the Henry County Sheriff's Department arrived on the scene with his canine "Cain," but they did not participate in the dog sniff analysis. While Officer Glover remained in his police car with Romero, Deputy Ernstes guided Manni to Romero's vehicle to conduct a dog sniff analysis. During this process, Manni showed interest in a Kleenex on the roadway near the driver's side door, but Deputy Ernstes directed Manni away from the Kleenex. Deputy Ernstes explained that he directed Manni away because the Kleenex was an unknown hazard. Upon closer inspection, prior to any search of the vehicle, Deputy Ernstes located a glass pipe commonly used for taking methamphetamine, underneath the car by the driver's door, near the area where the Kleenex was observed. After guiding Manni around the vehicle several times, Deputy Ernstes gave a thumbs up sign to Officer Glover and reported that Manni showed a great deal of interest to the trunk of Romero's vehicle and near the driver's door.

Based upon his belief that the dog sniff resulted in a positive indication of drugs and Deputy Ernstes' discovery of a methamphetamine pipe, Officer Glover handcuffed Romero and allowed him to remain seated in the passenger seat of his patrol car. Officer Glover then began to search through the trunk of the vehicle and discovered more than two kilograms of fentanyl. Once Officer

Glover confirmed that drugs were found in the vehicle, Romero was informed of his *Miranda* rights and arrested for possession of narcotics. Thereafter, Romero made certain admissions.

## II. DISCUSSION AND CONCLUSIONS OF LAW

In his Motion to Suppress, Romero asserts that the evidence obtained against him as a result of the traffic stop and the subsequent search of his vehicle violated the Fourth and Fifth Amendments of the United States Constitution ([Filing No. 34](#); [Filing No. 35](#)). Specifically, he argues that (1) Officer Glover lacked probable cause to conduct the traffic stop; (2) the traffic stop was unreasonably prolonged; (3) the search of his vehicle was not supported by probable cause; and (4) his statements cannot be considered when determining the existence of probable cause or otherwise used against him. *Id.* In contrast, the Government contends that the video of the traffic stop demonstrates Office Glover had sufficient probable cause to conduct a traffic stop, that the traffic stop was not unreasonably prolonged, and that Officer Glover developed reasonable suspicion of a crime independent of the traffic violation to justify the deployment of Manni and the subsequent search of Romero's vehicle ([Filing No. 37](#)).

### A. **Need for a Hearing**

Romero requested a hearing on his Motion to Suppress. "District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). Romero raised disputed issues of material fact, therefore an evidentiary hearing was held on April 23, 2018.

### B. **Validity of the Stop**

Romero contends that there was no probable cause to stop his vehicle, and therefore, the officers' actions were in violation of the Fourth Amendment to the United States Constitution.

5

Specifically, he argues that the traffic stop was a pretext and the resulting search of his vehicle was without probable cause; therefore, the evidence seized by the officers from his person and his vehicle must be suppressed. The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment prohibits a warrantless search unless the search falls under one of the recognized exceptions to the warrant requirement. *United States v. Denney*, 771 F.2d 318, 320 (7th Cir. 1985). If a search is conducted without a warrant, the government bears the burden to prove that an exception to the warrant requirement existed at the time of the search, or it will be deemed unreasonable and unconstitutional. *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001). When an officer effectuates a traffic stop and detains a person, no matter the length of time, it constitutes a "seizure" of "persons" under the Fourth Amendment, and thus must be reasonable. *Whren v. United States*, 517 U.S. 806, 810 (1996). The court in *Whren* explained that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*

Romero asserts that he did not commit a traffic infraction and denies that he was following any vehicle "too closely". He contends that the infraction of following too closely is subjective and there are virtually no standards, guidelines or definitions surrounding this traffic violation. Romero argues that Officer Glover and members of the PACE unit operating as a team, profiled his vehicle because he is Hispanic and was driving a vehicle with a California license plate on I-70, and then followed his vehicle waiting for him to commit an infraction so as to justify the detention and subsequent search of his vehicle.

The evidence before the Court shows that although the following too closely statute is subjective, Officer Glover had probable cause to stop Romero because he was following another

6

vehicle too closely. A person who drives a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of both vehicles, the time interval between vehicles, and the condition of the highway. Ind. Code § 9-21-8-14. Officer Glover's video camera turned on when he activated his lights and the video makes clear that at some points, Romero was following closely. The speed limit on I-70 was 65 miles per hour and traffic was traveling at approximately that speed. Officer Glover testified that he used the highway marker lines, which are 10 feet in length, and observed Romero within 30 or 40 feet—which is less than a second in distance—from the tractor-trailer traveling ahead of Romero. Regardless of the fact that the PACE unit was on the "lookout" for Romero's vehicle, Romero committed a traffic infraction and there was probable cause to stop his vehicle.

Romero's argument that the traffic stop was pretext, stemming from the PACE unit's mission "to apprehend individuals who are committing felonies and other criminal offenses along this area of I-70" is unavailing. Police may not use a traffic stop as a pretext to search for evidence. *United States v. Willis*, 61 F.3d 526, 530 (7th Cir. 1995). However, "if there was probable cause to make the stop, and if the stopping officer was acting with authority, the stop was not pretextual. 'So long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional.'" *Id.* (quoting *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989)). Additionally, the Fourth Amendment permits pretextual traffic stops as long as they are based on an observed violation of a traffic law. *Whren* at 810. Here, Officer Glover observed Romero commit a traffic infraction and had probable cause to initiate a traffic stop.

C. **Constitutional Duration of Traffic Stop**

Romero next argues that even if the Court concludes that the stop was justified, the duration was excessive. A seizure that is "lawful at its inception" can nonetheless violate the Fourth

7

Amendment if it is "prolonged beyond the time reasonably required to complete" the initial mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Traffic stops are not deemed unconstitutional based on their duration as long as the stop is not unreasonably prolonged. *United States v. Rodriguez*, 135 S. Ct. 1609, 1614-15 (2015). "[T]he Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Id*. at 1614.

Romero cites to *United States v. Rodriguez-Escalera,* 884 F .3d 661, 670 (7th Cir. 2018), as an opinion involving facts strikingly similar to those involving his arrest. Rodriguez was the passenger in a car pulled over on Interstate 70 for failing to signal a lane change, and officers alleged reasonable suspicion to lengthen the traffic stop after they noticed an odor of air fresheners,' inconsistency in answers to question unrelated to the purpose of the stop and a canine was called to the scene. (Filing No. 38 at 3). In *Rodriguez*, issuing the routine citation nearly took twenty-two minutes and it was not until nearly thirty-three minutes into the traffic stop that the canine arrived on the scene. *Rodriguez* at 665. Romero notes that the Seventh Circuit held that the district court judge, who had the benefit of video evidence, was free to interpret the evidence differently than the officers in concluding that what the arresting officer viewed as "'suspicious'" would necessarily describe a large category of innocent travelers. The district court granted the motion to suppress in *Rodriguez* and the Seventh Circuit affirmed.

Although the some facts in *Rodriguez* are similar, there are also distinctions. Officer Glover has conducted thousands of traffic stops in his career. He estimates that from the beginning of inputting information to issuing a traffic citation or a warning usually takes approximately 20 minutes. Here, within the first few minutes after the stop, Officer Glover had identified inconsistencies in the stories of Romero Orozco. Romero challenges the constitutionality of the officer's questioning and argues that he should have been *Mirandized*. However, roadside

8

questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for purposes of *Miranda*. *See Berkemer v. McVarty* 468 U.S. 420, 442 (1984).

The Fourth Amendment tolerates certain unrelated investigations that do not lengthen the roadside detention. *Rodriguez*, 135 S. Ct. at 1614. Within thirteen minutes of the stop, Deputy Ernstes and Manni had arrived and the canine investigation took only a few minutes. The duration of time prior to Manni's arrival, Officer Glover is seen working on his laptop computer entering data and he testified that he was processing the traffic citation and making "small talk".

An officer may conduct an investigatory stop of a person or vehicle if "articulable facts" support a reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). When evaluating reasonable suspicion, courts must consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 441, 417(1981). Officer Glover testified that reasonable suspicion of possible drug activity was supported by his knowledge that the vehicle had made numerous trips across the border in the last eight months, Romero and Orozco's inconsistent stories regarding their relationship, the odor of air fresheners, the age difference between Orozco and Romero, and Romero's nervousness. The Court acknowledges that the totality-of-the-circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Rodriguez-Escalera*, 884 F .3d 661, 670 (7th Cir. 2018), citing *U. S. v. Arvizu*, 534 U.S. 266, 273–74 (2002). The Court gives little weight to Officer Glover's testimony regarding suspicions raised by the age difference between Orozco and Romero, and Romero's nervousness, because Romero acted no more nervous than any other citizen would during a traffic stop. However, the remaining factors are credible to raise a reasonable suspicion.

Regarding Officer Glover's questions, the questions were somewhat impertinent, but they were reasonable and limited in scope. *See United States v. Felix-Felix*, 275 F.3d 627, 633 (7th Cir. 2001) (officer conducting *Terry* stop "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Here, the objective facts that Officer Glover observed gave him a reasonable basis for believing that criminal activity was afoot. Based on the totality of circumstances, the Court does not find that the thirteen minute stop before the canine arrived was unreasonably prolonged.

**D.**     **Probable Cause to Search Vehicle**

Finally, the Court must determine whether probable cause existed to search the vehicle. Manni indicating the existence of drugs in the vehicle would be sufficient to find probable cause to search the vehicle. *See Florida v. Harris*, 568 U.S. 237 (2013) (determining that an alert from a reliable drug-detection dog can support a finding of probable cause). Deputy Ernstes presides over the PACE unit and both he and his companion Manni, are certified canine officers. (Hr. Exhibit 4). Manni is trained to detect marijuana, cocaine, heroin and methamphetamine. Manni's first alert involves changes in breathing pattern, body posture and intense tail wagging. In particular, Deputy Ernstes testified that Manni exhibits as follows when he locates the source of odor:

> When Manni is in odor, he will exhibit many different physical traits. And that ranges from stiffening his body posture, wagging his tail, tilting like – throwing his ears, like rolling his ears back; as well as, you know, what we term as directing a direct sniff. When he's moving down a plane, he will tilt his head and/or move his head in a certain direction. And that is indicative to me when he is working a scent cone.

As reflected in Manni's training records, his final alert is to "sit and stare," (Hearing Exhibit 5).

Deputy Ernstes testified that the first alert he observed was on the driver's side and underneath the car, where Manni put his head down, which is where the Kleenex (and some sort of item) were observed. He next observed Manni alert to the back corner of the vehicle with a head tilt, ear drop, change in breathing and body posture, but Manni did not sit and stare. In contrast, Romero argues that Manni simply did not alert. He notes that during the walk around the vehicle, the video shows a happy dog who is wagging his tail at the same rate throughout the walk, and the wagging never gets more intense. Romero argues the head movements that the officer testified about are imperceptible and there are no visual signs of a change in Manni's behavior as he walks around the vehicle, until the handler touches the trunk on several occasions and Manni "stops and looks at it a little bit." Romero asserts that the change in breathing pattern that Deputy Ernstes says he observed is "junk science". He explains that throughout Manni's training records, it is clear that his final alert is a sit and stare and at no time did Manni sit and stare. Romero argues the PACE unit wanted a search, and when Deputy Ernstes arrived, he knew that Sgt. Goodwin and Officer Glover wanted a search and that "he wasn't about to disappoint them and say, that Manni didn't alert."

The Court agrees that is not clear from the video whether Manni actually alerted a positive for drugs, especially at the rear of the vehicle. The alert near the passenger door is not obvious on the video due to the angle of the camera. Regardless, the Court finds Deputy Ernstes' testimony to be credible regarding an alert to the Kleenex and pipe, because methamphetamine is an odor that Manni is trained to detect. However, the Court need not decide whether Manni did in fact signal a positive alert on the date of this incident. A review of the video clearly depicts Romero dropping something to the ground as he exits the vehicle and kick it under the car. Deputy Ernstes found and retrieved a methamphetamine pipe underneath the vehicle prior to Officer Glover conducting

any search. Accordingly, even in the absence of a canine alert, the discovery of Romero's methamphetamine pipe was clearly evidence of criminal activity. The officers had probable cause to search Romero's vehicle and the search was constitutional.

### III. CONCLUSION

For the reasons set forth above, Romero's Motion to Suppress is **DENIED** (Filing No. 34).

**SO ORDERED.**

Date: 5/14/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael J. Donahue
INDIANA FEDERAL COMMUNITY DEFENDERS
mike.donahoe@fd.org

MaryAnn Totino Mindrum
UNITED STATES ATTORNEY'S OFFICE
maryann.mindrum@usdoj.gov

Jeffrey D. Preston
UNITED STATES ATTORNEY'S OFFICE
jeffrey.preston@usdoj.gov